CONSUMER ADVISORY BOARD,
et al., Plaintiffs, Appellants,

v.

Robert W. GLOVER, et al.,
Defendants, Appellees.

Nos. 92–1550, 92–1638.

United States Court of Appeals,
First Circuit.

Heard Oct. 7, 1992.

Decided March 31, 1993.

Thomas H. Kelley with whom Judson Esty–Kendall, Pine Tree Legal Assistance, Inc., Portland, ME, and Neville Woodruff, Auburn, ME, were on brief, for plaintiffs, appellants.

Richard G. Bergeron, Asst. Atty. Gen., with whom Michael E. Carpenter, Atty. Gen., H. Cabanne Howard, and Thomas D. Warren, Deputy Attys. Gen., State of Me., Augusta, ME, were on brief, for defendants, appellees.

Before TORRUELLA, Circuit Judge, COFFIN, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOUDIN, Circuit Judge.

On July 14, 1978, Judge Edward T. Gignoux, now deceased, entered a consent decree in the district court settling a class action. The suit had been brought under 42 U.S.C. § 1983 against a number of state officials in Maine, including the Commissioner of Mental Health, on behalf of a class of mentally retarded Maine citizens. A focus of the suit was the operation of Pineland Center, a state institution for the mentally retarded.

The 1978 consent decree embodied two sets of standards to improve care and promote a less restrictive environment for class members. One set applied to Pineland Center and the other to community placement programs for the Center's outpatients. The 1978 decree provided that it and the two sets of standards were binding upon defendants and their successors, that a special master would be appointed to monitor implementation, that the court

would "retain[ ] jurisdiction over this matter for two years" and then consider whether to retain it further, and that "[a]ny party may, at any time, apply" to the court for any necessary or appropriate orders.

In fact Judge Gignoux continued active supervision of the case for about five years. In brief, on September 18, 1981, Judge Gignoux discharged Pineland Center from the court's "jurisdiction" and "supervision" after the special master submitted a report finding that the Center was in compliance with the standards applicable to it. The special master said in the same report that the Center would continue to be bound by the decree after its discharge and would thereafter be monitored by the state's Bureau of Mental Retardation.

Then, on November 22, 1983, the court held a hearing and issued a further order in which it "approve[d]" new recommendations of the special master, terminated his office, and "discharged" the remaining defendants "from the supervision of the Court." The 1983 order further stated that it, and the standards adopted in the 1978 consent decree, "shall be applicable to and binding upon the defendants and their successors." Finally, in the order the court "reserve[d] jurisdiction over the case for a period of three years," which might be shortened or extended upon motion. In his report, the special master explained that "the standards in the Consent Decree remain in force indefinitely...."

After the 1983 order, no further motions were filed or entries made in the docket for almost eight years. Then, on October 23, 1991, the Consumer Advisory Board and a group of Pineland Center residents, outpatients and guardians brought this action on behalf of Center residents and outpatients against the Commissioner of Mental Health and other state officials, seeking "enforcement" of rights created under the 1978 consent decree.[1] Ignoring the formality of the new law suit, the parties, and Judge D. Brock Hornby to whom the case was assigned, have sensibly treated the new action as if it were a motion filed in the earlier action to seek enforcement of the 1978 decree.

In the district court the defendants asserted that the 1978 decree had been terminated by the 1983 order no later than three years after the entry of that order, so that there was no consent decree to enforce. Judge Hornby agreed. In a memorandum decision, Judge Hornby concluded that the question was what Judge Gignoux meant in his 1983 order. After reviewing the language of the 1983 order and other indicia, Judge Hornby found that Judge Gignoux intended to terminate the court's authority to enforce the 1978 decree and made this intent clear. Judge Hornby then dismissed the case, without prejudice to a new action asserting present violations of federal law by defendants. This appeal followed.[2]

We believe that the dismissal must be vacated and the case remanded for further proceedings. We think it plain that the 1978 consent decree had no express termination date and that any intent to terminate it must be based upon later events. Whatever one might make of the reference in the 1978 consent decree to the court's retaining jurisdiction for two years, Judge Gignoux actively supervised the case for five years after entry of the decree in 1978 and the decree provisions themselves contained no specific time limit. Judge Hornby was therefore quite right to focus, as the parties in this court do, on the 1983 order and surrounding events.

---

1. The Consumer Advisory Board was an entity created under the decree to monitor performance and carry out other functions. Although the state has a footnote in its brief saying that it does not concede that the Consumer Advisory Board has standing, it does not argue the issue in this court nor does it question the standing of the other plaintiffs.

2. So that this case does not appear a sterile argument about captions, we note that the state agrees that a new action charging present federal law violations could be brought; but at the same time, it asserts that federal law has changed since the 1978 consent decree, *see Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), and that the original consent decree provisions would not be adopted today.

We reject any suggestion by the Consumer Advisory Board that the intent of the litigants in 1978 controls this case. It is quite true that consent decrees are a mixture of judgment and contract and that contract doctrine is often used to determine the meaning of terms in a decree. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 934–35, 43 L.Ed.2d 148 (1975). But even if we assume that both sides in 1978 viewed the decree as permanent, the district court has full power to terminate a continuing consent decree of this kind upon a determination that it has achieved its purpose or no longer serves the public interest. Fed.R.Civ.P. 60(b); *In re Donald Pearson*, 990 F.2d 653, 658 (1st Cir.1993). Ongoing decrees to reform public institutions, whether consented to or not, are adopted by courts subject to that power, regardless of whether the parties would like to bind the court forever. *System Federation v. Wright*, 364 U.S. 642, 651, 81 S.Ct. 368, 373, 5 L.Ed.2d 349 (1961); *Pearson*, 990 F.2d at 658.

Our focus, therefore, is upon the 1983 order. If its import depended solely upon Judge Gignoux's private intent, this would be a very close case. But it is Judge Gignoux's *expressed* intent that matters, and the Supreme Court has eased our task by requiring a clear statement of that intent in order to terminate the decree. In *Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, ——, 111 S.Ct. 630, 636, 112 L.Ed.2d 715 (1991), the Supreme Court held that the continuing injunctive decree at issue would be deemed terminated only after "a rather precise statement" of the district court's intention to terminate. *See also id.* at —— n. 3, 111 S.Ct. at 641 n. 3 (separate opinion of Justice Marshall). *Dowell* concerned a school desegregation decree, but we see no reason why a decree to reform a different kind of state institution should stand on different footing.[3]

The standard is eminently sensible. Continuing decrees are a peculiar beast in the legal menagerie. Especially where reform of an institution is involved, a court that has entered such a decree may pass through *levels* of disengagement as the decree moves toward achievement. After entry of the decree, there is often a period of active involvement—sometimes attended by close supervision, special masters, and adjustment of time tables and other details. Eventually the court may withdraw from active involvement, and the case may even be "closed" in official records. Yet the decree may live on as a legal obligation. If so, the court's authority to enforce it is always capable of being reawakened.

To require a clear statement before termination serves several ends. It means that those subject to a decree know that, absent such a statement, their obligations continue. *Cf. Dowell*, 498 U.S. at ——, 111 S.Ct. at 636. A clear statement also assures that those who secured or are protected by the decree will be on notice if and when a decree is terminated, so that they can oppose or appeal this crucial decision. *Id.* A clear statement test also reduces the chance of confusion as to whether the district court has merely reduced its involvement or actually nullified an important legal obligation. And to signal termination under this standard is extremely easy: all a district court need do is say that "the decree is terminated" or use any similar phrase.

Here, we think the state does have plausible arguments that Judge Gignoux meant to terminate the decree, but the other side has arguments of equivalent force. Thus, Judge Gignoux did say in his November 22, 1983, order that he "discharged" defendants from the court's "supervision" and "reserve[d] jurisdiction" over the case for three years. But the discharge from su-

---

3. It may be that terminating the decree in *Dowell* would have had a double impact, not only ending the existing obligations but making a new suit more difficult for *res judicata* reasons. But the Supreme Court, in requiring "a rather precise statement," rested simply on the need to give due notice to both sides as to the nature of, or changes in, decree obligations. *Id.* at ——, 111 S.Ct. at 636.

pervision clearly did not end the decree,[4] and the term "jurisdiction," while more portentous, is a term of many shadings. There is more than one case in which a district court has terminated its "jurisdiction" over a decree, intending only to close the case on its docket list, and without meaning to terminate ongoing obligations under the decree.[5]

The defendants also rely heavily upon the statement of Judge Gignoux, at the hearing held on the same day as the 1983 order, that the order marked "the end of this Federal Court's involvement with Maine's care of the mentally retarded." This statement cannot be taken literally, for the state clearly remained bound by the terms of the decree for at least another three years. Moreover, Judge Gignoux's statement must be read in the context of a proceeding celebrating the progress made by the state. And the Consumer Advisory Board has arguments of its own, including firm statements of the special master—apparently never contested until now—that the decree was an ongoing obligation that would endure well after initial compliance was achieved. Taking into account both the language of the 1983 order and the surrounding circumstances, we think that the order is at best ambiguous.[6]

In sum, a continuing obligation was created by the original 1978 consent decree. Nothing in the 1983 order and surrounding

circumstances comprises "the rather precise statement" needed under *Dowell* to terminate the decree. Interpretation of the 1983 order presents a question of law open to plenary review, *e.g., Suburban O'Hare Com'n v. Dole,* 787 F.2d 186, 193 (7th Cir.), *cert. denied,* 479 U.S. 847, 107 S.Ct. 169, 93 L.Ed.2d 106 (1986), and our disagreement with the able district judge simply underscores that the issue is fairly open to debate.

The Supreme Court's requirement of a rather precise statement to terminate consent decrees is not the whole story. In *Dowell* the Supreme Court has made clear that institutional reform decrees need not endure forever. 111 S.Ct. at 637. *See also* Fed.R.Civ.P. 60(b); *Pearson,* 990 F.2d at 657–58. Rather, the district court has considerable discretion, especially after years of apparent compliance have passed, to conclude that the decree should be dissolved because it has achieved its purpose or no longer serves the public interest. That remedy—which can be invoked by a motion to terminate the 1978 consent decree—remains fully available to the state. We note the point not to express any view upon the merits of such a motion but to make clear that the *Dowell* requirement of a rather precise statement is a procedural dictate and not a presumption that decrees should live forever.

**4.** Whether the state was in full compliance with the decree as of November 22, 1983, or instead on a course toward full compliance, is not entirely clear from the several, sometimes inconsistent remarks of Judge Gignoux and the special master. But the court's order of that date, just before retaining jurisdiction, says that "this Order and Appendices A and B [which were attached to the 1978 consent decree and contained the standards] shall be applicable to and binding upon the defendants and their successors...."

**5.** In addition to *Dowell* itself, where the district court had entered an order terminating its "jurisdiction" over the case, *see e.g., Youngblood v. Dalzell,* 925 F.2d 954, 955, 957 (6th Cir.1991) (district court terminated its jurisdiction over consent decree and "closed" the case without dissolving the decree), and *Roberts v. St. Regis Paper,* 653 F.2d 166, 171–72 (5th Cir.1981) (decree's provision providing for termination of

jurisdiction did not conflict with another decree provision establishing a "permanent" seniority system, as jurisdiction did not "refer[ ] to the life of the decree itself"). *See generally* Anderson, *Release and Resumption of Jurisdiction Over Consent Decrees in Structural Reform Litigation,* 42 U.Miami L.Rev. 401, 404, 413 (1987).

**6.** There is nothing wrong, where decree language is ambiguous, in looking to surrounding circumstances. Still, the further away such evidence takes us from the case at hand, the more doubtful its value and the less bearing it has on the district court's *expressed* intent. For that reason we need not discuss at length a different case (*Inmates of the Me. State Prison v. Oliver,* No. 11–187–S–D, slip op. (D.Me. May 10, 1987)) which the state offers as a parallel instance of Judge Gignoux using "jurisdiction" language to terminate a decree.

The judgment of the district court is *vacated* and the case remanded for further proceedings. No costs.