USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ___________________________ Nos. 92-2399 93-1013 DAVID BREWSTER, ET AL., Plaintiffs, Appellants, v. MICHAEL S. DUKAKIS, ET AL., Defendants, Appellees. _________________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Frank H. Freedman, Senior U.S. District Judge] __________________________ _________________________ Before Torruella, Selya and Boudin,* Circuit Judges. ______________ _________________________ Stephen J. Schwartz, with whom Cathy Costanzo and Center for ___________________ ______________ __________ Public Representation were on brief, for appellants. _____________________ Nonnie S. Burns and Hill & Barlow on brief for intervenor, _______________ _____________ Massachusetts Association for Retarded Citizens. Thomas A. Barnico, Assistant Attorney General, with whom __________________ Scott Harshbarger, Attorney General, Commonwealth of ____________________ Massachusetts, and William L. Pardee, Assistant Attorney General, _________________ were on brief, for appellees. _________________________ August 25, 1993 _________________________ _______________ *Judge Boudin has recused himself in this matter. Therefore, the case is decided by the two remaining panelists. See 28 U.S.C. ___ 46(d)(1988). SELYA, Circuit Judge. These appeals mark the most SELYA, Circuit Judge. _____________ recent chapter in institutional reform litigation that began almost two decades ago.1 On this occasion, plaintiffs argue that the district court erred both in banning future fee awards and in calculating fees for services rendered by their counsel in connection with the latest round of litigation. We agree with certain of plaintiffs' contentions, disagree with others, and dispose of the appeals accordingly. I I In December 1978, the district court entered a consent decree resolving a class action, started in 1976, that challenged the mental health regime maintained by the Commonwealth of Massachusetts at the Northampton State Hospital. The decree required the Commonwealth to develop a network of community residential facilities and nonresident support programs. On March 12, 1987, after approximately eight years of supervision, the district court entered a carrot-and-stick order in anticipation of bringing active judicial involvement to a close. The order set maintenance-of-effort provisions firmly in place, enunciated guiding principles, ranked priorities, and directed that certain further steps be taken. It also offered the Commonwealth a carrot, providing that, if all went well during the next three years, the district court would "end its ____________________ 1Prior phases of the litigation are chronicled in sundry opinions of this court. See, e.g., Brewster v. Dukakis, 786 ___ ____ ________ _______ F.2d 16 (1st Cir. 1986); Brewster v. Dukakis, 687 F.2d 495 (1st ________ _______ Cir. 1982); Brewster v. Dukakis, 675 F.2d 1 (1st Cir. 1982). We ________ _______ refer persons who hunger for additional detail to those opinions. 2 jurisdiction" over the mental health system in Western Massachusetts. This meant, the court explained, that it would terminate the decree although continuing the maintenance-of- effort provisions in effect. On October 25, 1990, the court issued a disengagement order that removed much of the case from judicial oversight but continued the court's control over a portion of the litigation until September 1, 1991. The 1990 order reiterated the court's promise to terminate supervision if sufficient progress transpired. On January 6, 1992, the court entered its final disengagement order. The court found that compliance had been achieved and, consequently, ordered: . . . that the Consent Decree entered on December 7, 1978 is hereby vacated, the Court's active jurisdiction over the case and the mental health system in Western Massachusetts is hereby ended, and this action is hereby dismissed. . . . In the same document, however, the court also stipulated: . . . that notwithstanding the foregoing order, the defendants are enjoined from violating Section III and Paragraph 43 of the Disengagement Order [continuing the maintenance-of-effort provisions] which shall remain in effect. Then, avowedly "pursuant to" its January 6 order, the court entered what it styled a "judgment of dismissal." Neither side appealed. In earlier proceedings, fees totalling approximately $675,000 had been awarded to plaintiffs' counsel for work done through October of 1990. After entry of the judgment of 3 dismissal, the parties' attention returned to these verdant pastures. Plaintiffs filed a further fee application which, as later supplemented, sought close to $30,000 in fees for the period November 1, 1990, to June 1, 1992. The Commonwealth opposed the request in several particulars and also asked the court to rule out, or at least cabin, future legal fees. On November 6, 1992, the district court granted the plaintiffs' fee application in part and denied it in part. Using reduced rates, the court awarded $12,766 for services rendered through January 6, 1992, but refused to allow fees for work performed after that date. The court also responded favorably to the Commonwealth's motion, stating that it would not award "any future attorneys' fees." Plaintiffs appealed. II II Plaintiffs' first and most salient attack is upon the district court's issuance of a categorical ban prohibiting future fees. They argue that, although the January 6 order and separate judgment purport to disengage the court from oversight and dismiss the case, the order explicitly continues in effect an injunction embodying the maintenance-of-effort provisions. Because there is an ongoing injunction, plaintiffs say, the district court, consistent with 42 U.S.C. 1988 (Supp. 1991), cannot wholly preclude fee-shifting as it relates to future proceedings that may implicate the injunction.2 ____________________ 2The statute pertinently provides that in any action to enforce specified civil rights laws, "the court, in its discretion, may allow the prevailing party, other than the United 4 The Commonwealth adopts a posture of confession and avoidance. It does not argue that an absolute bar on future fees is legally supportable a stance we take as an implied concession of the plaintiffs' basic point but, rather, it suggests that the court below meant only to preclude compensation for self-initiated monitoring efforts that might be undertaken thereafter by plaintiffs' counsel. In support of this reading, the Commonwealth points to an earlier appeal wherein this court suggested that it might be appropriate at some stage to ask the district judge "to relieve [the Commonwealth] of the burden of paying for private party monitoring." Brewster v. Dukakis, 786 ________ _______ F.2d 16, 19 (1st Cir. 1986). Thus, the Commonwealth asseverates, the November 6 order should be read not to prohibit all attorneys' fees, but simply to limit fees to future disputes, if any, in which the plaintiffs prove to be "prevailing part[ies]" within the meaning of section 1988. It is true that the November 6 order is to some extent opaque and that the district court's intent in entering it is correspondingly tenebrous. It is also arguably true that the district court's judgment of dismissal, together with the court's references to complete disengagement, may be consistent with an unqualified end to the litigation. And if this case were complete, then the issue of future fees would be moot (although an order barring them would then seem unnecessary). Yet the ____________________ States, a reasonable attorney's fee as part of the costs." 42 U.S.C. 1988 (b). 5 Commonwealth's interpretive legerdemain overlooks a crucial fact: the January 6 order, quoted supra p.3, states unequivocally that _____ the maintenance-of-effort provisions continue "notwithstanding" the dismissal. Unless these provisions are purely hortatory and the Commonwealth itself does not make such a claim there is still a permanent injunction operating in this case. We find that the injunction remains in effect. Our reasons are twofold. First, although the district court's dismissal in this case, taken alone, might betoken the end of the decree, the dismissal does not stand alone. By its terms, it was entered "pursuant to" an order of even date and the order itself is no less explicit that "notwithstanding" the proposed dismissal the defendants are "enjoined" from violating certain injunctive provisions which remain in force. A court's dispositive orders must be read as an integrated whole. Reading the instant record in that fashion, the various edicts clearly contemplate continuation of the injunction and so long as the injunction endures, the district court's enforcement authority can always be "reawakened." Consumer Advisory Bd. v. Glover, 989 _____________________ ______ F.2d 65, 67 (1st Cir. 1993); see also In re Pearson, 990 F.2d ___ ____ _____________ 653, 657 (1st Cir. 1993) (noting that when structural injunctions are left in place, they often require continuing judicial intervention). The second reason why we interpret the January 6 order along these lines is prophylactic: when, as in this case, there are two possible interpretations of a decree, one of which would 6 undermine the decree's validity and the other of which would be entirely unremarkable, the latter is plainly to be preferred. Were we to conclude that the Commonwealth's reading of the record was correct, a serious question would arise as to whether the judgment complied with the requirement that "a rather precise statement" be furnished before a district court can terminate an institutional reform decree. Board of Educ. v. Dowell, 498 U.S. ______________ ______ 237, 246 (1991). As we recently observed, courts entering such decrees often "pass through levels of disengagement as the decree ______ moves toward achievement." Glover, 989 F.2d at 67. Termination ______ of a decree has significant consequences for the parties, and Dowell requires that so important an event be plainly marked. ______ For these reasons, we construe the judgment of dismissal as closing the case administratively but leaving the injunction in effect. And, once this finding is juxtaposed with the text of the November 6 order which, as framed, can certainly be read to interpose a wholesale ban on future fees (indeed, that is the most natural reading of it) it follows inexorably that the latter order must be modified. Notwithstanding that 42 U.S.C. 1988(b) provides that the district court "may" award reasonable fees to a prevailing party "in its discretion," the Supreme Court has ruled that attorneys' fees must be awarded thereunder to a successful plaintiff "unless ____ special circumstances would render such an award unjust." Blanchard v. Bergeron, 489 U.S. 87, 89 n.1 (1989); see also de _________ ________ ___ ____ __ Jesus v. Banco Popular, 918 F.2d 232, 234 (1st Cir. 1990) _____ ______________ 7 (discussing operation of section 1988). Given this preeminent authority, an anticipatory negation of all future fees, in all circumstances, cannot easily be defended in an ongoing institutional reform case. The matter before us adequately illustrates the point. Here, one can easily envision circumstances say, an egregious violation of the maintenance-of-effort provisions requiring litigation to set matters right in which section 1988 could demand a further award of fees.3 Cf. Pearson, 990 F.2d at 657 ___ _______ (holding that when a structural injunction in an institutional reform case "has continuing effects, the issuing court retains authority to enforce it"). We could construct other examples, but no useful purpose would be served. Because it is perfectly plain that a total ban on future fees cannot be countenanced here, the district court's order needs adjustment. Lest the baby be discarded with the bath water, we also uphold the district court's ban on future fees insofar as the ban represents a determination that it is no longer reasonable to ____________________ 3The Commonwealth agrees that, in theory, there could be future litigation in this case for which compensation might properly be sought, but urges that fees should be granted only if plaintiffs prove to be the prevailing parties in such future litigation. Plaintiffs, by contrast, claim that once a suitor is found to have prevailed on a significant aspect of a civil rights case and obtains some relief, the district court is not obliged to subdivide counsel's bill into successful and unsuccessful elements. In plaintiffs' view, even unsuccessful aspects can be compensated, although reasonableness remains a constraint and the degree of success is often relevant to the fee. We think it unwise to attempt to resolve this conundrum in the abstract; after all, the district court did not address the standard for future fee awards and the problem may never arise. Hence, we express no opinion on these competing contentions. 8 remunerate counsel for routine monitoring of the decree (including the continuing injunction). Plaintiffs themselves do not object to this limitation on future compensable services and, given the lack of objection, we see no need to discuss the matter extensively. After all, when the court ruled that further monitoring would be superfluous, the litigation had been winding down for five years, the Commonwealth was in compliance, the decree had been truncated, and the case was being relegated to inactive status. Without wishing unduly to prolong the discussion, we add one further observation: by tradition and almost by necessity, district judges have great discretion in deciding what claimed legal services should be compensated, see, e.g., ___ ___ Phetosomphone v. Allison Reed Group, Inc., 984 F.2d 4, 6 (1st _____________ _________________________ Cir. 1993); Lipsett v. Blanco, 975 F.2d 934, 939-40 (1st Cir. _______ ______ 1992); Foley v. City of Lowell, 948 F.2d 10, 18-19 (1st Cir. _____ _______________ 1991), and there are times when an advance ruling by the trial court provides helpful guidance. So here, in regard to the gratuitous nature of future monitoring. III III Another disagreement between the parties concerns the hourly rates that plaintiffs' counsel should earn for work done from November 1990 to June 1992. Each of plaintiffs' two attorneys submitted affidavits reciting their qualifications and attesting to fees charged and paid at $195 per hour (lead counsel) and $125 per hour (associate counsel), respectively. 9 The district court did not succumb to these importunings, instead awarding lead counsel, Stephen Schwartz, $120/hr. for core legal work, and associate counsel, Cathy Costanzo, $80/hr. for such work. For non-core work, the court awarded lead counsel $80/hr. and associate counsel exactly half that rate.4 Plaintiffs assign error to the lower court's refusal to accept what plaintiffs term their lawyers' "established billing rates." The standards governing hourly rates applicable to shifted legal fees are hardly models of precision. The Supreme Court has endorsed the use of market rates as a starting point, see Blum v. Stenson, 465 U.S. 886, 895 (1984), but it also has ___ ____ _______ approved consideration of adjusting factors. See Pennsylvania v. ___ ____________ Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, _________________________________________________ 563-65 (1986); Hensley v. Eckerhart, 461 U.S. 424, 434 n.9 _______ _________ (1983). This court has followed the same course, see, e.g., ___ ____ Lipsett, 975 F.2d at 940-41; United States v. Metropolitan Dist. _______ ______________ __________________ Comm'n, 847 F.2d 12, 19 (1st Cir. 1988), and we have underscored ______ the ample discretion of the district judge the judicial officer who is most familiar with the case, the attorneys, and the interactive nuances in constructing fee awards. See, e.g., ___ ____ Foley, 948 F.2d at 19. _____ We think the current dispute can best be addressed by ____________________ 4In the district court's parlance, core work includes legal research, writing of legal documents, court appearances, negotiations with opposing counsel, monitoring, and implementation of court orders. Non-core work consists of less demanding tasks, including letter writing and telephone conversations. We upheld a similar taxonomy in Brewster, 786 ________ F.2d at 21. 10 putting it into historical perspective. In 1982, the district court allowed fees of $80/hr. for lead counsel's court activities and $70/hr. for his decree-implementation work. In 1985, these rates were increased to $95 and $85, respectively. In that time frame, we approved the rates as within the district court's discretion. See Brewster, 786 F.2d at 21. In 1991, the district ___ ________ court raised Mr. Schwartz's rates to $120/hr. for core work and $80/hr. for non-core work. At the same time, the court set associate counsel's rates at $80/hr. for core work and $40/hr. for non-core work. On each occasion, the court rejected plaintiffs' requests for more munificent rates. The several affidavits submitted to support plaintiffs' latest fee application aimed to fill gaps in proof and to show that counsel actually command the higher rates they seek here from other clients. In its fee order, issued on November 6, 1992, the district court reaffirmed the rates it had established in 1991, without discussing the latest set of affidavits. As a general rule, a fee-awarding court that makes a substantial reduction in either documented time or authenticated rates should offer reasonably explicit findings, for the court, in such circumstances, "has a burden to spell out the whys and wherefores." Metropolitan Dist. Comm'n, 847 F.2d at 18. But, _________________________ there are occasions on which fee-setting judges "should be permitted to draw conclusions and make adjustments without full articulation." Jacobs v. Mancuso, 825 F.2d 559, 564 (1st Cir. ______ _______ 1987). 11 This is such an occasion. The trial court made the necessary bottom-line findings. Although subsidiary findings would have been desirable, mitigating circumstances abound: the judge (who has done a stellar job over almost two full decades) knew the case inside out; the rates used by the trial court are the very figures adopted in 1991, the year in which much of this work was done; those rates were not appealed when first used; and the newly claimed hours are relatively few in number. Finally, this is the caboose of a litigation train that has chugged along for almost two decades. Given the singular nature of the situation and the age of the case, we are reluctant to press the district court for supplementary explanation. Believing, as we do, that the additional expense to be incurred in seeking perfection would be a poor investment, we decline to disturb the district court's reaffirmation of the rates it set in 1991. IV IV The last point of contention involves the district court's refusal to consider awarding fees for services rendered after January 6, 1992. The court took this position solely because it believed that no compensation should be paid for work performed after the date of its last disengagement order. In light of our holding that a categorical ban on future fees cannot stand, see supra Part II, the blanket disallowance of fees ___ _____ referable to services rendered subsequent to the bar date must likewise fall. We must now decide what to do with the disallowed 12 hours. Bearing in mind that the district court never addressed individual entries in the time records submitted for this period, we would ordinarily remand so that the court might reevaluate the situation. But, the circumstances here are out of the ordinary: the contentiousness surrounding the lawyers' compensation threatens to overshadow the main case a somewhat Kafkaesque development since the case furnishes the sole raison d'etre for ______ ______ the compensation. The Supreme Court has repeatedly cautioned that a fight over fees, within the broader framework of a litigated case, ought not take on a life of its own. See, e.g., ___ ____ Hensley, 461 U.S. at 436 ("A request for attorney's fees should _______ not result in a second major litigation."). Put bluntly, fee disputes, unlike Jack's beanstalk or Pinocchio's nose, cannot be permitted to grow and grow and grow. In kindred circumstances, we have refused to let the tail wag the dog. We have recognized, for example, that when a trial court has improvidently disallowed certain time, an appellate court, so long as the record is reasonably complete, may appropriately take the bull by the horns, forgo a remand, and recalculate the fee award without further ado. See, e.g., Pearson v. Fair, 980 F.2d 37, 45 (1st ___ ____ _______ ____ Cir. 1992); see also Foster v. Mydas Assocs., Inc., 943 F.2d 139, ___ ____ ______ ___________________ 144 n.8 (1st Cir. 1991) (listing representative cases); cf. ___ Navarro-Ayala v. Nunez, 968 F.2d 1421, 1428 (1st Cir. 1992) _____________ _____ (applying the same principle to a required recalculation of monetary sanctions). Because this case fits the model, we turn directly to the necessary computation. 13 The block of time in question aggregates 51.9 hours (31.6 hours attributable to Mr. Schwartz and the remainder attributable to Ms. Costanzo).5 Lead counsel's time entries deal exclusively with fee-related work. We have repeatedly held that time reasonably expended in connection with fee applications is itself compensable, see, e.g., Lund v. Affleck, 587 F.2d 75, ___ ____ ____ _______ 77 (1st Cir. 1978), but, since time spent in this exercise often amounts to little more than "documenting what a lawyer did and why he or she did it," Gabriele v. Southworth, 712 F.2d 1505, ________ __________ 1507 (1st Cir. 1983), it may fairly be compensated at a reduced rate. See id.; accord Jacobs, 825 F.2d at 563; Miles v. Sampson, ___ ___ ______ ______ _____ _______ 675 F.2d 5, 9 (1st Cir. 1982). Thus, we accept lead counsel's fee-related time in toto, but direct that it be valued at the __ ____ rate applicable to his non-core work. This portion of the incremental fee is, therefore, $2528, viz., 31.6 hrs. x $80/hr. = ____ $2528. We treat associate counsel's incremental time in two segments. We award plaintiffs the miscoded time, see supra note ___ _____ 5, in its entirety.6 Using the dollar figure computed by ____________________ 5The situation is complicated by a careless mistake contained in the plaintiffs' fee application. In that submission, plaintiffs identified a block of Ms. Costanzo's time, totalling 18.3 hours, as having been spent in 1992. So labelled, _ the time was disallowed. Plaintiffs now allege for the first time that these hours were misrecorded and actually represent time spent in 1991. Upon close perscrutation, the entries' text _ appears to bear out the allegation. 6In the circumstances at bar, we choose not to penalize plaintiffs for their labelling error. We do not mean to suggest, however, that a fee-setting court lacks discretion to discount fees because of sloppiness in the fee-seeker's presentation. 14 plaintiffs under the district court's approved rates, see ___ Appellants' Brief at 31 n.19, and mindful that the Commonwealth has not criticized the computation, we value this time at $1150. We add to this figure $80, representing the remaining two hours of Ms. Costanzo's time. In doing so, we note that these hours were spent in fee-related endeavors and should, therefore, be remunerated at her non-core rate. As a final check, we have paused to consider whether the fee award, as adjusted, appears reasonable in the circumstances and is in overall proportion to what remained at stake in the winding-down of the litigation. See Jacobs, 825 ___ ______ F.2d at 563 (suggesting such an overview). We conclude that the requirement of reasonableness is fully satisfied. The revised award is fair to plaintiffs and their counsel, although slightly less generous than they had thought due; it is, at the same time, fair to the Commonwealth, although slightly more extravagant than it had hoped. While we anticipate that all the parties will be displeased, the fact that a fee award leaves both payer and payee somewhat sullen is often a sign of fairness all around. V V We need go no further. The order appealed from is affirmed in part and vacated in part. The case is remanded for the entry of a revised fee award for the period ended June 1, 1992, increasing the amount of attorneys' fees from $12,766 to ____________________ Cf., e.g., Grendel's Den v. Larkin, 749 F.2d 945, 956 (1st Cir. ___ ____ _____________ ______ 1984) (finding "no reason to apply the Fees Act in such a way as to give delinquent applicants a second chance to recover"). 15 $16,524. The court below shall also enter a new judgment eliminating the absolute bar on future fee requests (assuming such an absolute bar was intended), making explicit the bar on future fees for self-initiated monitoring, and clarifying that the limited injunction remains in effect until further order. Should plaintiffs believe they are entitled to fees or costs on appeal, they may file an application pursuant to 1st Cir. Loc. R. 39.2. It is so ordered. It is so ordered. ________________ 16