**INMATES OF the SUFFOLK COUNTY JAIL, et al., Plaintiffs,**

v.

**Robert C. RUFO, et al., Defendants.**

**Civ. A. No. 71–162–K.**

United States District Court,
D. Massachusetts.

March 31, 1993.

Max D. Stern, Lynn G. Weissberg, Stern & Shapiro, Boston, MA, for plaintiffs.

Thomas O. Bean, Atty. General's Office, Chester A. Janiak, Burns & Levinson, Boston, MA for defendants.

MEMORANDUM AND ORDER

KEETON, District Judge.

This case is before the court on motions for modification of the consent decree of May 7, 1979 (as modified by the orders of April 11, 1985 and April 22, 1985) in accordance with the decision of the Supreme Court, vacating this court's order of April 9, 1990 and remanding for application of the standard of consideration set forth by the Court in *Rufo v. Inmates of Suffolk County Jail,* —— U.S. ——, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).

On remand, the matter before the court for reconsideration is the motion of the Sheriff of Suffolk County ("Sheriff") pursuant to Fed. R.Civ.P. 60(b)(5) and (6), to modify the consent decree to permit the double-bunking of inmates in 197 of the 322 regular male housing cells at the new Suffolk County jail at Nashua Street.

Also before the court are two motions filed after the case was remanded: (1) the motion of the Sheriff to modify the consent decree to hold up to forty Suffolk County female pretrial detainees at the Suffolk County House of Correction at South Bay, Boston, Massachusetts (Docket No. 173, filed April 7, 1992); and (2) the motion of the Commissioner of Correction for the Commonwealth ("Commissioner") to vacate the consent decree (Docket No. 185, filed April 9, 1992). I consider these motions, along with the Sheriff's motion for modification to allow double-bunking, under the standard set forth in the Supreme Court's decision in *Rufo.*

For the reasons explained in this Memorandum, I deny each of the pending motions for modification because each fails to propose a modification suitably tailored to the changed circumstances shown by the record before me.

### I.  Procedural History

In 1971, the inmates of the old Suffolk County Jail at Charles Street ("Charles Street Jail"), a pretrial detention facility, brought suit claiming that conditions at the jail violated their constitutional rights. The procedural history of this litigation is well documented in many published opinions. *See, e.g., Rufo v. Inmates of Suffolk County Jail,* —— U.S. ——, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992); *Inmates of Suffolk County Jail v. Kearney,* 928 F.2d 33 (1st Cir.1991); *Inmates of Suffolk County Jail v. Kearney,* 573 F.2d 98 (1st Cir.1978); *Inmates of Suffolk County Jail v. Eisenstadt,* 494 F.2d 1196 (1st Cir.1974); *Inmates of Suffolk County Jail v. Kearney,* 734 F.Supp. 561 (D.Mass.1990); *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676 (D.Mass.1973). Only a brief outline is presented here.

The Charles Street Jail was originally built in 1848. It was designed to house one inmate per cell (hereinafter "single-bunking"). By 1971, when the inmates brought this suit, the practice was to house two inmates per cell (hereinafter "double-bunking").

The inmates of the Suffolk County Jail, the plaintiff class, are those persons, male and female, in the custody of the Sheriff of Suffolk County, awaiting trial on criminal charges having either been denied bail, or unable or unwilling to post bail. Also held in the jail, though not part of the plaintiff class, are those convicted defendants awaiting transfer to the custody of the state Commissioner of Correction.

The case was drawn to Judge Garrity. In 1973 he determined that the conditions in the jail violated the rights of pretrial detainees, "presumptively innocent citizens," under the due process clause of the Fourteenth Amendment. *Eisenstadt,* 360 F.Supp. at 686. Judge Garrity ordered a permanent injunction against double-bunking at the jail and further enjoined defendants from holding any detainees at the Charles Street Jail after June 30, 1976. *Id.* at 691.

When defendants had failed to devise an acceptable plan for a new facility within the time allowed, they sought relief from the injunction. Judge Garrity reset the closing date of the jail to June 30, 1977. During the ensuing appeal of that order, the Court of Appeals adopted the parties' stipulation in which plaintiff class agreed to delay again the closing of the jail "in exchange for an enforceable commitment by defendants to adopt and execute a plan for construction of a new jail, within a reasonable time and according to specified criteria." *Kearney,* 734 F.Supp. at 562–3. The Court of Appeals

stayed Judge Garrity's order until March 3, 1978, by which time the parties were to submit a plan. *Kearney*, 573 F.2d at 99.

Eventually Judge Garrity approved a consent decree on May 7, 1979. It provided for the continued use of the old jail while a new one was built according to specifications designed to " 'provide, maintain[,] and operate as applicable a suitable and constitutional jail for Suffolk County pretrial detainees.' " *Rufo*, —— U.S. at ——, 112 S.Ct. at 755 (quoting *Inmates of Suffolk County Jail v. Kearney*, Civ. Action No. 71–162–G (D.Mass. May 7, 1979)). "The preamble to this decree noted the desire of all parties 'to avoid further litigation on the issue of what shall be built and what standards shall be applied to construction and design' [of the new jail]...." *Kearney*, 734 F.Supp. at 563 (quoting Consent Decree at 2).

The original plans for the new jail provided for 309 single-occupancy cells, to house, in separate modules, both male and female detainees. The plan was subsequently modified, with plaintiffs' consent, to take into account the higher than expected inmate population by expanding the number of cells in the new jail to 453. The modifications, however, still conformed to the standards and the purposes of the original decree, including the maintenance of single-bunking in the revised designs. *See Kearney*, 734 F.Supp. at 562–63. Ongoing litigation in the state courts, and the ensuing modifications of the consent decree in the United States district court, deferred the construction starting date to 1987.

In July 1989, nineteen years after commencement of the action and ten years after entry of the consent decree, the new jail was still under construction. The Sheriff again sought to modify the consent decree, this time to allow double-bunking in 197 of the newly constructed cells. The Sheriff argued that changes in law and fact justified the modification. *See Id.* at 564. The asserted change of law was the 1979 decision of the Supreme Court in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), handed down only months after the entry of the consent decree in this case. In *Bell*, the court held that double-bunking was not in all circumstances unconstitutional. *Id.* at 542, 99 S.Ct. at 1875. The asserted change of fact was another alleged unanticipated increase in the inmate population.

This court denied the request for modification. *Kearney*, 734 F.Supp. at 564.

The new Suffolk County Jail at Nashua Street ("Nashua Street Jail") opened in May 1990. A few months thereafter, the Court of Appeals affirmed this court's decision not to modify the decree again. *Inmates of Suffolk County Jail v. Kearney*, 915 F.2d 1557 (1st Cir.1990), judgt. order reported at 915 F.2d 1557. The Supreme Court granted certiorari, 498 U.S. 1081, 111 S.Ct. 950, 112 L.Ed.2d 1039 (1991), and, after hearing, reversed and remanded, with direction that the appropriate standard for considering a motion to modify a consent decree such as the one entered in this case is a flexible one allowing modification where the moving party establishes as a threshold matter "that a significant change in circumstances warrants revision of the decree." *Rufo*, —— U.S. at ——, 112 S.Ct. at 760. The moving party "may meet its initial burden by showing either a significant change in factual conditions or in the law." *Id.* If the party seeking modification meets this burden, the court "should consider whether the proposed modification is suitably tailored to the changed circumstance." *Id.*

After remand, this court allowed the requests of the parties for several months of additional discovery, set a briefing schedule and set a date for hearing, received evidence by affidavit and by oral testimony at an evidentiary hearing on December 14, 1992, heard oral argument on January 12, 1993, and by a more recent order allowed supplementation of the record.

After consideration of the entire record before me, for the reasons explained below, I deny the Commissioner's motion to vacate the consent decree and conclude that the pending motions to modify the consent decree are not supported by the record now before the court. Each of the modifications proposed fails the test that this court "should consider whether the proposed modification is suitably tailored to the changed circum-

stance[s]." *Rufo,* —— U.S. at ——, 112 S.Ct. at 760.

The rulings recited here, however, do not preclude consideration of a further proposal to modify upon an adequate showing that it is suitably tailored to changed circumstances. As explained in this memorandum, the court will confer with counsel about a schedule for prompt consideration of any further proposal and any other matter that need be considered before finally closing proceedings in this ancient case, subject only to reopening for enforcement of the terms of the consent decree as amended by orders previously entered, or to be entered.

## II. Findings of Fact

The Sheriff proposes that the consent decree, which requires single-bunking, be modified to allow the Sheriff to double-bunk in nine of the modular units designated as regular male housing units. These designated units contain a total of 322 cells, of which 197 are proposed for double-bunking. This modification would increase the total male capacity from 419 to 616; 394, or 64% of the men, would be double-bunked. With a female capacity of 34, the total capacity at the jail with double-bunking would be 650.

The Sheriff also proposes to remove all female pretrial detainees from the Nashua Street facility and instead to house up to forty female pretrial detainees at the Suffolk County House of Correction at South Bay ("House of Correction") in either single-bunked or double-bunked cells, as the court allows. This modification would permit the Sheriff to hold male detainees in the cells currently allocated for females at the Nashua Street Jail.

### A. Stipulated Facts

Many of the material facts are stipulated by the parties.

The Nashua Street Jail is a modern, seven-story structure of steel, concrete, and brick construction. It provides conditions of confinement far superior to those at the former Charles Street jail, which had been determined to be below constitutionally mandated standards.

In accordance with the consent decree, as previously modified, the facility was designed with the following inmate housing areas: 316 regular male holding cells, 32 cells for administrative and disciplinary segregation, 8 cells for protective custody, 22 cells for an infirmary, 35 cells for classification, and 40 cells in the female housing unit. Under current operation, however, the number of cells used as regular male holding cells has been increased to the number 322, and 34 cells, at maximum, are committed to holding female detainees. Permission to house female detainees in a 34–cell module rather than a 40–cell module (as long as the number of female detainees does not exceed 34) was implicit in this court's memorandum and order of August 30, 1990, although that order was not formally declared to be a further "modification" of the consent decree.

Each modular unit for holding inmates in the Nashua Street Jail is configured to function independently of the rest of the jail with respect to most inmate services and activities. Each regular male modular housing unit contains 34 to 40 cells, a common area—consisting of a day room, a separate multi-purpose ("quiet") room, an exercise area, attorney-client meeting rooms, visiting rooms, and counseling rooms for use by case workers. Each modular unit also contains a "kitchenette" for serving meals prepared in the jail's central kitchen and laundry facilities for inmates' personal laundry. For each two modular units there is an outdoor recreation area.

The females are housed in a similarly configured unit of 34 cells.

Located between each two modular units is a Control Room that is staffed by a jail officer. Over every cell door in each modular unit is an electronic remote control. An emergency release feature simultaneously unlocks all cell doors. From inside the Control Room, each modular unit may be monitored through the unit's intercom system. Three combination microphone/speaker intercoms are located in each modular housing unit.

The cells have cinder-block walls, cement floors, and steel doors. The construction materials of the jail are fire-resistant. The jail is equipped with a comprehensive fire detection and sprinkler system, including

smoke detectors and sprinklers in each cell. The activation of any smoke detector or sprinkler results in immediate notification to both the Boston Fire Department and the Central Control Room at the jail.

The goals of the fire safety and evacuation plan are prevention, early detection, evacuation from affected area and containment. Under this plan, all inmates from an affected modular housing unit would be moved out of that unit into a "safe refuge," typically another modular unit, within the jail. Emergency egress from the jail would occur only if necessary as a last resort. A fire safety and evacuation plan for the modular units to be double-bunked under the Sheriff's proposed modification has been approved by the Boston Fire Department and an outside consultant retained by the Suffolk County Sheriff's Department. The fire safety and evacuation plan complies with standards of the American Correctional Association.

Each cell door is solid (and, of course, blocks vision) except for a window measuring 7⅞ by 35⅞ inches. (The extent of visibility through this window is disputed, and further findings on this matter are stated in part II.C.2 below.) The smallest cells in each modular unit where the Sheriff proposes to double-bunk are approximately 70 square feet in total area, of which an area of approximately 40 square feet is unencumbered.

Under the Sheriff's proposed plan to double-bunk, the officer assigned to the Control Room would monitor the modular unit visually and with the modular unit's intercom system. The intercom would be left open or in the "on" position and the televisions in the day room and multi-purpose room of each modular unit would be turned off at all times while inmates are confined to their cells.

Under the proposed plan, double-bunked inmates would be out of their cells at least 14¾ hours per day and locked in their cells no more than 8¼ hours per day. Inmates would be in their cells, with the doors unlocked, for approximately one hour per day. During the day and evening shifts two officers would be assigned to each modular housing unit, and during the midnight to 8:00 a.m. shift, a single officer would be assigned. All double-bunked modular units would be fully staffed during the periods for staff meals. In addition, each Control Room would be staffed at all times.

The design and staffing of each modular housing unit, with single-bunked cells, is such that inmates are under the observation of the jail officers who can more readily observe incidents of assaultive behavior than in traditionally designed jails. The parties dispute whether this statement would hold true if the cells were double-bunked.

The Sheriff proposes to double-bunk inmates in accordance with the Suffolk County Jail Classification Program. Under this program, the suitability of inmates for double-bunking would be reviewed based upon information from the booking officer's observations, social worker interviews, nurse's report of medical history, physician's physical examination, probation records, Suffolk County Jail records (including disciplinary records, previous charges, social service records, medical records, and where applicable, Department of Mental Health records).

Under the classification program, inmates who meet any of the following criteria would not be double-bunked: previous incidents of a violent or assaultive behavior against inmates, pending or previous charges of rape or sexual assault, a determination that the inmate is under the influence of drugs or undergoing withdrawal from drugs, any indication of mental illness or problem that may result in increased tensions between cellmates, or a diagnosis that the inmate presents a risk of transmitting an infectious disease.

It is undisputed that no method is available to jail authorities that would guarantee that tuberculosis will not enter the jail.

The Suffolk County Sheriff's Department has a policy of reporting, investigating, and prosecuting incidents of assaultive behavior between inmates and providing medical examinations and treatment, if needed. During the entire period of use of the Charles Street Jail before June, 1973 (during the more recent years of which period double-bunking was in effect), there was one instance of the killing of one inmate by another. There have been none since, either at the Charles Street Jail or the Nashua Street Jail. From May

18, 1990, when the Nashua Street Jail opened, through April 30, 1992, 72 inmates suffered physical assaults requiring some medical treatment at the jail, and eight inmates required outpatient treatment at a hospital.

On a regular basis since at least 1989, more pretrial detainees have been committed to the Sheriff's custody than could be single-bunked at the Suffolk County Jail. Since the Nashua Street Jail opened, however, no inmate has ever been released to the street in order to comply with the single-occupancy requirement of the consent decree. No provision of the consent decree, nor order of this court, moreover, requires such release.

From June, 1990 to October 1992, the average number of inmates transferred to halfway houses was fewer than 3 per month. From October, 1990 to April 1992, less than 1% of the available halfway house beds were used.

The cost to Suffolk County of transporting detainees to other facilities in order to maintain single-cell occupancy at the jail from October 1990 to April 1992 was $115,710 (about $6,000 per month on average). (The evidence before the court does not support findings as to whether this figure includes some costs of transportation to courts for hearings as distinguished from transportation between the jail and another holding unit.)

In 1991, the default rate for persons released on bail in Suffolk County for the District Courts and the Superior Court was 37%.

### B. Disputed Factual and Evaluative Contentions

The Sheriff proposes the following disputed factual and evaluative findings: (1) That increases in jail or prison populations are difficult to predict and are beyond the control of public officials, such as the Sheriff, who are responsible for holding inmates. (2) That the Sheriff has taken all reasonable measures to accommodate increases in the number of inmates being committed to his custody, and that this finding is supported by his successful 1985 request to modify the consent decree to increase the number of cells in the Nashua Street Jail and his ac-

tions in seeking funding from the Commonwealth for additional cell space in Suffolk County. (3) That the Sheriff did not actually anticipate an increase in the pretrial population committed to his custody when the consent decree was signed in 1979, or any increase beyond that for which provision was made in the modification of the consent decree in 1985. (4) That the Sheriff has maintained single-cell occupancy at the Suffolk County Jail only by transferring inmates committed to his custody to other county correctional facilities or to correctional facilities of the Commonwealth that are already overcrowded. (Sheriff's Proposed Findings of Fact and Rulings of Law at 8 and 9, ¶¶ 43–45.)

As support for his assertion that he has made every reasonable effort to accommodate the increases in the inmate population, he cites the maintenance and expansion of the Bail Appeal Project, which provides legal services for bail appeals to the Superior Court, and the pretrial Controlled Release Program under which inmates, who meet appropriate criteria, are released to halfway houses, the Boston Employment Resource Center, or the Boston Day Reporting Center. (*Id.* at 9, ¶ 46.)

The Sheriff insists that, if he is not allowed to double-bunk in some of the 322 regular male holding cells, he will be forced to transfer even larger numbers of inmates committed to his custody to other county correctional facilities or to correctional facilities of the Commonwealth. (*Id.*, ¶ 47.)

The Sheriff asserts, furthermore, that maintaining the single-bunking requirement of the consent decree is not in the best interest of the inmates committed to his custody. In support of this contention he proposes these additional disputed findings: (5) Conditions in transfer facilities are vastly inferior to those at the Nashua Street Jail. (6) All of these institutions provide only double-bunked cells, some as small as 46 square feet. (7) Those inmates transferred outside of Suffolk County are moved farther away from their attorneys, families, and friends. (*Id.* at 9–10, ¶¶ 48–9.)

The Sheriff also supports his argument with the following additional disputed factual assertions: (8) The cost of transporting the inmates to and from correctional facilities outside the county is substantial and is wasteful. (9) At least twenty percent of inmates transferred to halfway houses, under the special First Criminal Session bail reviews, default by walking away from the halfway house. (10) Inmates committed to the Sheriff's custody are typically charged with serious felonies, are not suitable for release to the street, and if released would pose a significant risk to public safety and of failing to appear for trial. (11) Those inmates suitable for reduction in bail or release on recognizance are provided for in the programs noted above. (*Id.* at 10, ¶¶ 50–53.)

Defendants argue that the classification program by which the Sheriff would determine who is to be double-bunked meets the standards of the American Correctional Association (ACA) and has been reviewed and approved by the ACA, the Department of Correction of the Commonwealth, and James Austin of the National Council on Crime and Delinquency, an independent consultant. (*Id.* at 5, ¶ 23.) Plaintiffs dispute the projected efficacy of the classification program. Plaintiffs' experts contend that the program would be ineffective in predicting the suitability of inmates for double-bunking. (Third Buckley Aff. ¶ 9; Paulus Aff. ¶ 15.) One of plaintiffs' experts asserts that the proposal gives an incentive for engaging in violent behavior as a means of insuring a single-bunked cell. (Paulus Aff. ¶ 15.)

The Sheriff argues that the Nashua Street Jail has a comprehensive medical program for screening, diagnosis, and treatment of inmates, including mandatory screening of all inmates and staff for tuberculosis and the isolation of inmates who represent a risk of infection to other inmates. (Sheriff's Proposed Findings of Fact and Rulings of Law at 7, ¶ 32.) The inmates dispute the Sheriff's assessment of the tuberculosis risk, arguing that the Sheriff's proposal to double-bunk was made without regard to the effect of double-bunking on the transmission of an airborne infectious disease like tuberculosis. (Pls.' Reply Mem. at 6.) Plaintiffs argue that double-bunking in the Nashua Street Jail would unnecessarily expose the pretrial detainees to risks associated with transmission of infectious diseases and increased violence. (Pls.' Proposed Findings of Fact at 5, ¶¶ 19 and 21.)

## C. Findings on Disputed Facts

### 1. The current sustained rise in the inmate population was not foreseen.

The numbers of pretrial detainees continue to be above the limits set by the consent decree for the Nashua Street Jail. I find that increases in some dimension were foreseeable as at least quite likely, if not more probable than not, both when the consent decree was fashioned and when it was later modified. But I find also that the current numbers of pretrial detainees are higher than actually anticipated or reasonably foreseeable, either when the consent decree was entered, or when the previous modifications of the consent decree were sought and approved.

The reasons for the increases are only partly explained by the record before me. The extent to which the increases result from changes in policies and practices of state authorities (affecting, for example, the incidence and duration of pretrial detention) are not explained in the record before me. In any event, I find that all the parties to this case thought, in good faith, when entering into the consent decree, that the total number of male and female detainees would be a number not too great to be held in the Nashua Street facility, with single-bunking in effect throughout.

### 2. The single-bunking requirement was a significant objective of the consent decree.

I find that the provision that the new facility would be designed with single-occupancy cells, if not the central objective, was at the least among the most significant objectives of the consent decree. I find, furthermore, that the plaintiff class would not have consented if the decree had not included a single-bunking requirement. (*See* Goldstein Aff. ¶¶ 3 and 5, Pls.' Appendix, v. II.)

### 3. Double-bunking would substantially increase the risk of violence in the cells under their current design.

The present cells in the Nashua Street Jail were explicitly designed for single-bunking. They are slightly smaller in area than the cells in the old Charles Street facility. The contemporaneous views of expert consultants who participated in recommendations for design of the Nashua Street facility were that cells of this size were acceptable only because they were meant for single occupancy.

A change in use to double-bunking would substantially increase risks of violence in areas of a cell beyond the view of monitors, both as the cells and modular units are arranged and constructed and as they would be arranged and constructed under the proposed modifications. (*See* Fourth Rothman Aff. ¶ 11–13.) It is difficult—perhaps impossible—to quantify the degree of this increase of risk on the evidence before me, but I find it to be substantial.

### 4. The risk of infectious diseases would be exacerbated by double-bunking.

The risks associated with the presence of tuberculosis in a pretrial detention facility have recently commanded special attention. I find it inappropriate, however, to make a long-range decision regarding modification of the consent decree based solely or even primarily on these risks. The record before the court—because of the recency of this problem and the present state of scientific assessment, and not by reason of any lack of diligence of the parties in addressing the issue—is a very insecure basis for strong reliance by decisionmakers.

The highly contagious nature of tuberculosis is, nevertheless, a concern. Data do show that transmission tends to be greater in prisons than in society generally. (*See* Safyer Aff. ¶ 10.) All of the expert physicians consulted agreed that, despite precautions, the disease cannot be kept out of prisons and jails, including the Nashua Street Jail. (Hrg Tr. at 84, Dec. 14, 1992.) Evidence supports the finding, and I find, that once a case of active tuberculosis is in the jail, double-bunking is a "very effective mechanism [for transmission]." (Hrg Tr. at 23, Dec. 14, 1992.)

Inmates have been infected by tuberculosis in other correctional facilities. If a double-bunked inmate developed active tuberculosis, there would be a risk (and, I find, an increase in risk incident to double-bunking) of transmission to his cellmate.

### 5. Alternatives to double-bunking

A refusal by government decisionmakers to appropriate more money is not, without a reasoned and supportable explanation of the refusal, an excuse for noncompliance with the consent decree. The decision as to whether the consent decree should be modified cannot be determined by a standard that considers only how well the Sheriff performs with the limited resources made available to him by other official decisionmakers. ·

The contentions of the Sheriff, recited in part II.B above, fail to come to grips with this central deficiency in the Sheriff's argument that the modifications he proposes are tailored to changes in circumstances that justify modification of a consent decree. A continued and unexplained failure of other public officials to provide resources consistent with maintaining the terms of the consent decree is not one of the identified changed circumstances justifying modification when no proffer of any justification for the failure has been made.

Conditions of confinement that fail to measure up to constitutional standards cannot be excused because the public official immediately responsible for custody of pretrial detainees has done the best he can do with the limited resources other officials of the legislative and executive branches of state and local governments have made available. In contrast, financial constraints may have relevance to modification of a consent decree. *See, e.g., Rufo,* —— U.S. at ——, 112 S.Ct. at 764 ("Financial constraints may not be used to justify the creation or perpetuation of constitutional violation, but they are a legitimate concern of government defendants in institutional reform litigation and therefore are appropriately considered in tailoring a consent decree modification."). It does not follow, however, that financial constraints alone become decisive of whether a proposed modification of a consent decree is tailored to

changed circumstances. A justification for modification cannot be determined solely by the Sheriff's good faith and creditable performance.

The issue is more complex than simply determining what the Sheriff can do with resources now available to him, when the record does not even support a finding that those resources, today, are comparable in dimension to resources that were available at the time when the consent decree was entered in 1979, and when modified later. Thus, a proposed modification that rests primarily on arguments of the Sheriff's good faith and creditable performance falls short of facing up to the core problem that the court must consider in determining whether a modification proposed is suitably tailored to changed circumstances.

A second core deficiency in the Sheriff's proffer is the failure to identify and evaluate, in comparison with the extensive double-bunking program the Sheriff proposes, alternative uses of the limited resources that have been and foreseeably will be available to the Sheriff. This point will be discussed more fully in part III.C, below.

### III. Application of the Legal Standard for Modification of Consent Decrees

Under the legal standard established by the Supreme Court for considering proposals for modification of a consent decree such as that now at issue, this court must first consider (1) whether the increase in the pretrial detainee population was unforeseen by the parties, and (2) whether the parties based their agreement on a misunderstanding of the governing law. (The parties whose perceptions and agreement must be considered include not only the Sheriff but as well, at a minimum, the other parties who continue to be bound by the consent decree—not just the only other party defendant (the Commissioner) who has chosen to appear in the proceedings before the court on the motions for modification.) If either condition (1) or condition (2) is shown, the court must then determine "whether the proposed modification is tailored to resolve the problems created by the change in circumstances." *Rufo,* —— U.S. at ——, 112 S.Ct. at 764. "A court

should do no more, for a consent decree is a final judgment that may be reopened only to the extent that equity requires." *Id.*

### A. Arguments of the Parties

The parties positions, briefly stated, are as follows:

#### 1. The Sheriff of Suffolk County

Defendant Rufo contends that, between the entry of the consent decree in April, 1979, and the present date, and between the modification in May, 1985, and the present date (or, as well, the opening of the Nashua Street Jail in May, 1990) there was an unanticipated increase in the number of Suffolk County pretrial detainees committed to the Sheriff's custody. (Sheriff's Proposed Findings of Fact and Rulings of Law at 11, ¶¶ 2 and 5.) This unanticipated increase, according to the Sheriff, has made compliance with the consent decree substantially more onerous, and the terms of the consent decree "unworkable." (*Id.* at 11, ¶ 3.) Sheriff Rufo argues, therefore, that continuing to enforce the single-bunking requirement would be detrimental to the public interest. (*Id.* at 11, ¶ 4.)

Sheriff Rufo argues that the proposed modification to double-bunk 197 cells at the Nashua Street Jail (1) does not create or perpetuate a constitutional violation, and (2) does not strive to rewrite the consent decree to conform with the constitutional floor. (*Id.* at 12, ¶¶ 7–8.)

Concluding that his proposal is "narrowly tailored to resolve the problems created by the unanticipated increase in the pretrial detainee population," Sheriff Rufo states the purposes of his plan as follows:

(1) to avoid the release to the street of inmates for whom it has been judicially determined that bail is required to insure their appearance at trial and avoid interference with the Commonwealth's bail statute;

(2) to hold the inmates committed to his custody in the county where they reside and in the best possible setting and avoid interference with the Commonwealth's scheme of county jails, houses of correc-

tion[,] and state correctional institutions; and

(3) [to] permit the Sheriff to discharge the obligations imposed upon him by state law and the courts of Suffolk County.

(*Id.* at 12, ¶ 10.)

The Sheriff argues that his double-bunking proposal does not constitute punishment under the deliberate indifference standard (under *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) and other cited authorities), and is a reasonable means to achieve legitimate governmental objectives. (*Id.* at 13, ¶ 12.)

### 2. *The Inmates*

Plaintiffs contend that allowing modification of the consent decree to permit double-bunking would require the court to become more involved in overseeing the day-to-day operations of the jail, in order to insure that the protection against impairment of inmate rights and interests, which single-bunking was to provide, is somehow provided in other ways. (Plaintiffs' response to Sheriff's Proposed Order at 1–5.)

Plaintiffs argue that neither the Sheriff's proposed order nor the Commissioner's draconian proposal to vacate is the most appropriate relief, neither being sufficiently tailored even to the changed circumstances defendants allege, *id.* at 6–7, which plaintiffs further contend defendants have failed to prove.

### 3. *The Commissioner of Correction*

The Commissioner does not support the Sheriff's proposal for modification because, he argues, the plan would require unnecessary judicial involvement in the day-to-day administration of the jail. (Commissioner's Mem. in Supp. of Mot. to Vacate at 7, Docket No. 200, filed Nov. 6, 1992.) He concludes, furthermore, that because the Commissioner must accept (from the Sheriff) inmates committed to the Sheriff in excess to the number that can be held in the Nashua Street Jail, "the orders in this case . . . rob the Commissioner of the ability to control the flow of county inmates to State facilities." *Id.*

Rather than submitting his own plan for modification, however, the Commissioner challenges the consent decree and this court's jurisdiction over the case, arguing that it is no longer equitable for the consent decree to have prospective effect. *Id.* at 9.

Because it would be dispositive of the other motions, I deal first with the Commissioner's motion to vacate the consent decree.

### B. The Commissioner's Motion to Vacate

■ Throughout the history of this case after entry of the consent decree, the court has been concerned about whether the terms, or proposed terms, of modifications of the consent decree would tend to lead to the court's becoming involved in resolving disputes about day-to-day operations of the jail. The consent decree includes provisions of detail that a court would have been unlikely to fashion, and would be unlikely to accept as part of a court order or decree except when jointly proposed by the parties as a consent decree settling their disputes.

The Commissioner's proposed way of avoiding undue involvement of the court in day-to-day implementation of the consent decree is an unacceptable extreme—simply let the Sheriff have unfettered discretion to order double-bunking without any constraints or limitations as to criteria regarding associated conditions of confinement. The Commissioner contends not only that the court should not require that single-bunking be maintained but also that the court should not require that any other safeguards be instituted in lieu of single-bunking to carry out the objectives of the decree as fashioned by consent. This hard-line approach is plainly incompatible with this court's obligation, under the order of remand, to consider whether any proposed modification of the consent decree is suitably tailored to changed circumstances. The Commissioner of Corrections' position must be rejected. His motion, accordingly, is denied.

### C. The Sheriff's Motions to Modify

### 1. *The Sheriff's motion for modification to remove female detainees from the Nashua Street Jail*

■ There is no evidence in the record with respect to the conditions of confinement

at the House of Correction, where the Sheriff proposes to relocate female detainees. This deficiency alone is sufficient to cause the court to determine that the present record does not support the Sheriff's motion for modification to remove female detainees from the Nashua Street Jail. The proposal is deficient also for failure to show consideration of alternatives. (*See* part IV.C.2 below, explaining this point as applied to the double-bunking proposal.) This motion for modification, accordingly, is denied.

### 2. The Sheriff's motion for modification to allow double-bunking

■ After consideration of the Sheriff's double-bunking proposal at the Nashua Street Jail, the stipulated facts, and my findings on disputed facts, as set forth above, I find that the Sheriff's proposed modification is not suitably tailored to changed circumstances shown by the record before me. Accordingly, the Sheriff's motion for modification is denied.

I come to this conclusion, however, with the view that my ruling should be without prejudice to the submission of a proposal with an adequate showing of fit. Though I have rejected the Sheriff's request to double-bunk, now before me, it does not follow that no acceptable alternative could be fashioned for a modified use of the Nashua Street facility in a way that would meet the objectives of the consent decree, including protection against abuse and undue risk of contagion. Accordingly, although I have determined that I should deny the present motions for modification, I do not foreclose consideration of another proposal submitted promptly, with evidentiary support that justifies a finding that it is suitably tailored to changes in circumstances, beyond the control of the defendants after due effort, from the circumstances existing when the decree was entered (or from circumstances existing when it was modified).

This consent decree is not as restrictive as defendants, in their briefs, describe it. It does not, for example, prohibit state officials from dealing with a rise in the inmate population—whether temporary or longer range in nature, as can best be predicted on an evidentiary record—by developing new physical facilities. Nor does it purport to control all pretrial detention facilities to be built in the future. Of course, any new physical facilities, either within or outside the physical limits of the Nashua Street location, would be limited by constitutional requirements. If outside the physical limits of the Nashua Street location, however, they might not be subject to the consent decree. Although it might be necessary to hear the inmates were they to claim broader application of the consent decree, they have not so asserted in current proceedings, and I need not and do not consider that question now.

The Sheriff's present claim for modification to allow double-bunking fails because he has made no showing of reasoned exploration of other feasible alternatives that would maintain rather than impair the integrity of the consent decree. For example, he has not proffered to the court any showing of consideration and rejection, on supportable grounds, of other possible means of using the facility without physical modification. Also, he has proffered no basis for comparing the costs and benefits of physical modifications that would downgrade the excellent Nashua Street facility (as double-bunking would do) with the costs and benefits of developing other facilities (either on-site or off-site). Instead, he proposes modifications that substantially change the character of a public facility that was built specifically to satisfy the standards of the consent decree and the public concerns underlying those standards.

Nor has the Sheriff made any showing of participation and consultation in the decision-making process by the responsible and interested public officials (other than himself and the Commissioner, who are, apparently, working at odds with one another). For example, the record before the court reflects that rather than reaching a reasoned decision after evaluating the various options before them, the Commissioner and the Sheriff have filed separate motions, neither of which is tailored to the changed circumstances demonstrated in the record.

In sum, the Sheriff's motion for modification of the consent decree to allow double-bunking in the Nashua Street Jail is not

sufficiently tailored to the changed circumstances shown. The Sheriff's motion, accordingly, is denied.

## ORDER

For the foregoing reasons, it is hereby ORDERED:

(1) the motion of the Commissioner of Correction for the Commonwealth to vacate the consent decree (Docket No. 185, filed April 9, 1992) is DENIED;

(2) the motion of the Sheriff to modify the consent decree to hold up to forty Suffolk County female pretrial detainees at the Suffolk County House of Correction at South Bay, Boston, Massachusetts (Docket No. 173, filed April 7, 1992) is DENIED;

(3) the motion of the Sheriff for modification of the consent decree to allow double-bunking in 197 of the regular cells for male pretrial detainees is DENIED; and

(4) a conference is scheduled for Friday, April 30, 1993 at 3:00 p.m., in Courtroom 11, Third Floor, United States Courthouse and Post Office Building, Post Office Square, Boston, MA 02109.