USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1460 INMATES OF THE SUFFOLK COUNTY JAIL, ET AL., Plaintiffs, Appellees, v. ROBERT RUFO, SHERIFF OF SUFFOLK COUNTY, ET AL., Defendants, Appellants. __________ COMMONWEALTH OF MASSACHUSETTS, ET AL., Defendants, Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ ____________________ Before Torruella, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ Douglas H. Wilkins, Assistant Attorney General, with whom Scott ___________________ _____ Harshbarger, Attorney General, and Thomas O. Bean, Assistant Attorney ___________ ______________ General, were on brief for appellants. Max D. Stern with whom Lynn Weissberg and Stern, Shapiro, ______________ _______________ ________________ Rosenfeld & Weissberg were on brief for appellees. _____________________ ____________________ December 21, 1993 ____________________ CAMPBELL, Senior Circuit Judge. The Commissioner _____________________ of Corrections for the Commonwealth of Massachusetts (the "Commissioner"), defendant-appellant, brought a motion in the United States District Court for the District of Massachusetts to vacate a consent decree of May 7, 1979 (as modified by the orders of April 11, 1985, and April 22, 1985)1 entered into by the Sheriff of Suffolk County (the "Sheriff"), the Commissioner, and others with the inmates of the Suffolk County Jail (the "Inmates"),2 the plaintiff- appellee class. The district court denied the Commissioner's motion. Inmates of the Suffolk County Jail v. Rufo, 148 _____________________________________ ____ F.R.D. 14 (D. Mass. 1993). The Commissioner appeals, arguing, inter alia, that the district court mistakenly __________ treated his motion to vacate as if it were a motion to modify the consent decree. We affirm. I. This appeal is part of an ongoing saga involving the construction and the operation of the new Suffolk County Jail on Nashua Street in Boston, Massachusetts (the "Nashua Street Jail"), which replaced the old Suffolk County Jail on Charles Street (the "Charles Street Jail"). The early ____________________ 1. A copy of the original consent decree is included as an appendix to this Opinion. 2. The Inmates are those individuals, male and female, in the custody of the Sheriff of Suffolk County, who are awaiting trial on criminal charges, and who have either been denied bail or who are unable or unwilling to post bail. -2- chapters of this drama, which began in 1971, need not be repeated. They are fully set out in published opinions. See, e.g., Inmates of the Suffolk County Jail v. Kearney, 928 ___ ____ __________________________________ _______ F.2d 33 (1st Cir. 1992); Inmates of the Suffolk County Jail ___________________________________ v. Rufo, 148 F.R.D. 14 (D. Mass. 1993); Inmates of the ____ _______________ Suffolk County Jail v. Kearney, 734 F. Supp. 561 (D. Mass.), ___________________ _______ aff'd mem., 915 F.2d 1557 (1st Cir. 1990), vacated, Rufo v. __________ _______ ____ Inmates of the Suffolk County Jail, ___ U.S. ___, 112 S. Ct. __________________________________ 748, 116 L. Ed. 2d 867 (1992); Inmates of the Suffolk County ______________________________ Jail v. Eisenstadt, 360 F. Supp. 676 (D. Mass. 1973), aff'd, ____ __________ _____ 494 F.2d 1196 (1st Cir.), cert. denied, 419 U.S. 977, 95 S. ____________ Ct. 239, 42 L. Ed. 2d 189 (1974). We pick up the story in July 1989, approximately ten years after the consent decree was entered. "In July 1989, while the [Nashua Street Jail] was still under construction, the [S]heriff moved to modify the consent decree to allow the double bunking of male detainees in 197 cells, thereby raising the capacity of the [Nashua Street Jail] to 610 male detainees."3 Rufo v. Inmates of ____ __________ ____________________ 3. The Sheriff's motion was brought pursuant to Fed. R. Civ. P. 60(b)(5) and (6), which state: On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should -3- the Suffolk County Jail, ___ U.S. ___, ___, 112 S. Ct. 748, ________________________ 756, 116 L. Ed. 2d 867 (1992). "The Sheriff argued that changes in law and fact [constituted new and unforeseen circumstances that] justified the modification." Rufo, 148 ____ F.R.D. at 16. "The asserted change in law was [the Supreme Court's] 1979 decision in Bell v. Wolfish, 441 U.S. 520, 99 ____ _______ S. Ct. 1861, 60 L. Ed. 2d 447 (1979), handed down [shortly] after the consent decree was approved by the District Court.4 The asserted change in fact was the increase in the population of pretrial detainees." Rufo, 112 S. Ct. at 756 ____ (footnote not in original). The district court denied the Sheriff's request to modify the consent decree. Inmates of the Suffolk County _______________________________ Jail v. Kearney, 734 F. Supp. 561 (D. Mass.), aff'd mem., 915 ____ _______ __________ ____________________ have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The district court found that the Sheriff relied initially on the provision of Fed. R. Civ. P. 60(b)(5) that authorizes the modification of a judgment if "it is no longer equitable that the judgment should have prospective application." According to the district court, "[t]his portion of the rule codifies the standard set out in United States v. Swift & Co., 286 _____________ ____________ U.S. 106, 119, 52 S. Ct. 460, 464, 76 L. Ed. 999 (1932), which dealt with a court's inherent power to modify." Kearney, 734 F. Supp. at 563. In Swift, the Supreme Court _______ _____ held that "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned." Swift, 286 U.S. at 119. _____ 4. "In Bell, the [Supreme Court] held that double-bunking ____ was not in all circumstances unconstitutional." Rufo, 148 ____ F.R.D. at 16. -4- F.2d 1557 (1st Cir. 1990). It held that the Sheriff had failed to meet the standard for the modification of consent decrees imposed by United States v. Swift & Co., 286 U.S. ______________ ____________ 106, 119, 52 S. Ct. 460, 464, 76 L. Ed. 999 (1932).5 The district court also "stated that, even under the flexible modification standard adopted by other Courts of Appeals, the [S]heriff would not be entitled to relief because `[a] separate cell for each detainee has always been an important element of the relief sought in this litigation perhaps even the most important element.'" Rufo, 112 S. Ct. at 756-57 ____ (quoting Kearney, 734 F. Supp. at 565) (footnote omitted). _______ As a final matter, the district court "rejected the argument that the decree should be modified because the proposal complied with constitutional standards, reasoning that such a rule `would undermine and discourage settlement efforts in institutional cases.'" Id. at 757 (quoting Kearney, 734 F. ___ _______ Supp. at 565). This court affirmed the district court's decision. Inmates of the Suffolk County Jail v. Kearney, 915 F.2d 1557 ___________________________________ _______ (1st Cir. 1990). Thereafter, the Supreme Court granted certiorari, 498 U.S. 1081, 111 S. Ct. 950, 112 L. Ed. 2d 1039 (1991), and, after hearing, vacated the decision below and remanded for further proceedings consistent with its opinion. Rufo, 112 S. Ct. at 765. The Supreme Court ruled that the ____ ____________________ 5. For a description of this standard, see supra note 3. _____ -5- district court had erred in applying the rigid "grievous wrong" standard of United States v. Swift to the Sheriff's _____________ _____ motion to modify the consent decree. Id. at 757-58 (holding ___ that Fed. R. Civ. P. 60(b) does not intend that "modifications of consent decrees in all cases [are] to be governed by the standard actually applied in Swift . . . [but _____ rather] permits a less stringent, more flexible standard"). The Court observed that "[t]he experience of the district and circuit courts in implementing and modifying such decrees has demonstrated that a flexible approach is often essential to achieving the goals of [institutional] reform litigation." Id. at 758. Against this backdrop, the Court held that "a ___ party seeking modification of a consent decree bears the [initial] burden of establishing that a significant change in circumstances warrants revision of the decree." Id. at 760. ___ To meet this initial burden, a party seeking modification of an institutional reform consent decree may show "either a significant change in factual conditions or in law." Id. ___ Once the party seeking modification meets this standard, "the court should consider whether the proposed modification is suitably tailored to the changed circumstance."6 Id. ___ ____________________ 6. The standard announced by the Rufo Court applies only to ____ motions to modify institutional reform consent decrees. The ______ Court did not have before it the "question [of] whether [in whole or in part] the . . . decree should be vacated." Rufo, _______ ____ 112 S. Ct. at 763 n.12 (emphasis added). -6- On remand, the district court reconsidered the Sheriff's motion to modify the consent decree to permit the double-bunking of inmates in 197 of the 322 regular male housing cells at the Nashua Street Jail. The court also considered two other motions filed after the case was remanded, one of which was the Commissioner's present motion to vacate the consent decree altogether.7 See Rufo, 148 ___ ____ F.R.D. at 15. The district court denied all three motions. The district court explained its denial of the Sheriff's motion for modification to allow double-bunking of pretrial detainees at the Nashua Street Jail in a comprehensive opinion, concluding that "the Sheriff's proposed modification [was] not suitably tailored to changed circumstances shown by the record." Id. at 24. According to ___ the district court, the Sheriff had not "made [a] showing of reasoned exploration of other feasible alternatives that would maintain rather than impair the integrity of the consent decree." Id. Nevertheless, the district court ruled ___ that, "[t]hough [it] ha[d] rejected the Sheriff's request to double-bunk, . . . it does not follow that no acceptable alternative could be fashioned for a modified use of the Nashua Street facility in a way that would meet the ____________________ 7. The third motion was a "motion of the Sheriff to modify the consent decree to hold up to forty Suffolk County female pretrial detainees at the Suffolk County House of Correction at South Bay, Boston, Massachusetts." Rufo, 148 F.R.D. at ____ 15. -7- objectives of the consent decree, including protection against abuse and undue risk of contagion." Id. Therefore, ___ the district court did "not foreclose consideration of another proposal submitted promptly, with evidentiary support that justifies a finding that it is suitably tailored to changes in circumstances, beyond the control of the defendants after due effort, from the circumstances existing when the decree was entered (or from circumstances existing when it was modified)." Id. The Sheriff appealed from the ___ district court's denial of his two motions, but agreed to stay his appeal pending further proceedings on a new motion to modify filed in the district court. We were told at argument that proceedings regarding this motion are in progress in the district court. In explaining its denial of the Commissioner's separate motion to vacate the consent decree, the district court began by stating that the Commissioner did not support the Sheriff's proposal for modification because the Commissioner felt that "the plan would require unnecessary judicial involvement in the day-to-day administration of the jail." Id. at 23. The district court noted that the ___ Commissioner objected to being forced by orders in this case to accept from the Sheriff the overflow from the Nashua Street Jail. The district court went on to say: Rather than submitting his own plan for modification, . . . the Commissioner -8- challenges the consent decree and this court's jurisdiction over the case, arguing that it is no longer equitable for the consent decree to have prospective effect. . . . * * * The Commissioner's proposed way of avoiding undue involvement of the court in day-to-day implementation of the consent decree is an unacceptable extreme simply let the Sheriff have unfettered discretion to order double- bunking without any constraints or limitations as to criteria regarding associated conditions of confinement. The Commissioner contends not only that the court should not require that single- bunking be maintained but also that the court should not require that any other safeguards be instituted in lieu of single-bunking to carry out the objectives of the decree as fashioned by consent. This hard-line approach is plainly incompatible with this court's obligation, under the order of remand, to consider whether any proposed modification of the consent decree is suitably tailored to changed circumstances. The Commissioner of Corrections' position must be rejected. His motion, accordingly, is denied. Id. ___ II. On appeal, the Commissioner argues that the district court applied the wrong legal standard when ruling on his motion to vacate the consent decree. The Commissioner asserts that the district court mistakenly applied the Supreme Court's Rufo standard, which he says relates only to ____ motions to modify, not to vacate, institutional reform ______ ______ -9- consent decrees. According to the Commissioner, a district court that rules upon a motion to vacate an institutional reform consent decree must consider only whether the defendants are in present compliance with constitutional requirements and whether the effects of the original violation have abated. Maintaining that these conditions have been met, the Commissioner contends that the district court erred in refusing to vacate the decree, and he seeks a remand so that the court can reconsider the issue. Although we agree with the Commissioner that motions to vacate consent decrees and motions to modify them involve somewhat different analytical frameworks, we find the Commissioner's proposed standard inadequate. We also think that, whatever the weaknesses of its stated rationale, the lower court properly declined to vacate the consent decree under the present circumstances and at the present time. III. As an initial matter, "[w]e note that [describing] the appropriate legal standard [to be applied by district courts to motions to vacate institutional reform consent decrees] presents a pure question of law, subject to de novo _______ review." Societe des Produits Nestle, S.A. v. Casa ____________________________________ ____ Helvetia, Inc., 982 F.2d 633, 642 n.9 (1st Cir. 1992); see, ______________ ___ e.g., Stauble v. Warrob, Inc., 977 F.2d 690, 693 (1st Cir. ____ _______ ____________ 1992). Moreover, even should we find that the district court -10- applied an incorrect legal standard to the Commissioner's motion to vacate the consent decree, we may, in appropriate circumstances, affirm the district court's denial of the Commissioner's motion if we are satisfied that the district court's decision was correct. See, e.g., Knight v. Mills, ___ ____ ______ _____ 836 F.2d 659, 661 n.3 (1st Cir. 1987) ("It is proper for an appellate court to affirm a correct decision of a lower court _______ even when that decision is based on an inappropriate ground." (emphasis in original)). In determining the propriety of the district court's decision, we may affirm on any independently sufficient ground supported by the record, see Willhauck v. ___ _________ Halpin, 953 F.2d 689, 704 (1st Cir. 1991), and we review the ______ district court's resolution of mixed questions of law and fact under a clearly erroneous standard, United States v. _____________ Rule Indus., 878 F.2d 535, 542 n.7 (1st Cir. 1989). ___________ IV. In Board of Education v. Dowell, 498 U.S. 237, 111 ___________________ ______ S. Ct. 630, 112 L. Ed. 2d 715 (1991), and more recently in Freeman v. Pitts, ___ U.S. ___, 112 S. Ct. 1430, 118 L. Ed. _______ _____ 2d 108 (1992), the United States Supreme Court described the standard for district courts to apply when deciding whether to dissolve injunctive orders previously entered in school desegregation cases. While the desegregation cases have a special history and context all their own, many of the same considerations would appear to be relevant to other types of -11- institutional reform litigation. This circuit has cited to Dowell's principles in cases involving consent decrees ______ pertaining to conditions at correctional facilities and to the treatment of mentally ill or retarded persons. See, ___ e.g., In re Pearson, 990 F.2d 653 (1st Cir. 1993) (petitioner ____ _____________ sought writ of mandamus to halt the district court's efforts to evaluate, by the appointment of a special master, the continuing need for, or the possible modification of, consent decrees affecting the operation of a state institution, the Massachusetts Treatment Center for Sexually Dangerous Persons); Consumer Advisory Bd. v. Glover, 989 F.2d 65 (1st ______________________ ______ Cir. 1993) (Consumer Advisory Board and a group of residents and outpatients of Pineland Center, a state institution for the mentally retarded, brought action on behalf of Center residents and outpatients against the Commissioner of Mental Health and other state officials, seeking enforcement of rights created under a 1978 consent decree). In Dowell, the Supreme Court stated that ______ desegregation decrees should not exist forever. See Dowell, ___ ______ 498 U.S. at 248 ("[I]njunctions entered in school desegregation cases . . . are not intended to operate in perpetuity."). This circuit has invoked this principle in other kinds of institutional reform cases. See Pearson, 990 ___ _______ F.2d at 658 ("In institutional reform litigation, injunctions should not operate inviolate in perpetuity."); Glover, 989 ______ -12- F.2d at 68 ("[I]nstitutional reform decrees need not endure forever."). In all types of institutional reform litigation, federalism concerns dictate that any "intrusion by a federal court into the affairs of local government should be kept to a bare minimum and not be allowed to continue after the violation has abated and its pernicious effects have been cured." Mackin v. City of Boston, 969 F.2d 1273, 1276 (1st ______ _______________ Cir. 1992), cert. denied, 113 S. Ct. 1043, 122 L. Ed. 2d 352 _____________ (1993). In Dowell, 498 U.S. at 247, 249-50, as supplemented ______ by Freeman, 112 S. Ct. at 1446, the Supreme Court indicated _______ that there are two conditions that must be met before a district court is essentially obliged to terminate a litigated decree and return the institution or programs under court supervision to the governance of state or local authorities. First, the district court must determine that the underlying constitutional wrong has been remedied, either fully or to the full extent now deemed practicable. See Dowell, 498 U.S. ___ ______ at 247, 249-50; Glover, 989 F.2d at 69. Second, there must ______ be a determination that the authorities have complied with the decree in good faith for a reasonable period of time since it was entered. See Freeman, 112 S. Ct. at 1446; ___ _______ Dowell, 498 U.S. at 249-50. ______ -13- Implicit in these requirements is the need for the district court, before terminating the decree entirely, to be satisfied that there is relatively little or no likelihood that the original constitutional violation will promptly be repeated when the decree is lifted. See Dowell, 498 U.S. at ___ ______ 247 ("[A] finding . . . that the Oklahoma City School District was being operated in compliance with the commands of the Equal Protection Clause of the Fourteenth Amendment, and that it was unlikely that the Board would return to its _____________________________________________________________ former ways, would be a finding that the purposes of the ____________ desegregation litigation had been fully achieved." (emphasis added)). Whether authorities are likely to return to former ways once the decree is dissolved may be assessed by considering "[t]he defendants' past record of compliance and their present attitudes toward the reforms mandated by the decree." Lloyd C. Anderson, Release and Resumption of ____________________________ Jurisdiction Over Consent Decrees in Structural Reform _____________________________________________________________ Litigation, 42 U. Miami L. Rev. 401, 411 (1987) (citing __________ Morgan v. McDonough, 689 F.2d 265, 280 (1st Cir. 1982)). Of ______ _________ possible further relevance is the way that demographic, economic, and political forces may be expected to influence local authorities and the institution once the shelter of the decree has been lost. Obviously, there can be no perfect certainty that the original constitutional violation will not be repeated. -14- No one can demand such an assurance too far into the future. But it would be a travesty of the two requirements just stated that the violation be eliminated and that the officials have shown their commitment to obey the law if a decree could be terminated in the face of substantial evidence that the same underlying violation would then be resumed. These general statements leave many questions unanswered. One, as already mentioned, is the extent to which they can be extended from the school desegregation cases, in which the statements were made, to all other institutional reform decrees including those involving prisons. Our tentative view, as said, is that they probably can be so extended, although the point need not be decided definitively. Another question, perhaps more perplexing, is whether there ought to be any difference in treatment between a litigated decree and a consent decree when it comes to standards for termination; arguments can be made on both sides and, again, we need not definitely resolve the question. Finally, there is the question of whether and to what extent the "extra" remedial protections of the decree, at least if embodied in a bargained-for consent decree, ought to remain relevant when the underlying federal violations have entirely ceased and are not likely to recur. As with -15- the others, there are plausible arguments on both sides of this question.8 We see no need, however, to resolve these issues at this time. For purposes of the present appeal, it is enough to assume arguendo that the proper standard for decree ________ termination is the one most favorable to the Commissioner that we can imagine being adopted by the Supreme Court. On this view of the law, the Commissioner would arguably be entitled to termination of the decree if the Commissioner could show: that the federal violations of the type that provoked the original action have been entirely remedied or remedied to the full extent feasible;9 that a reasonable ____________________ 8. The plaintiffs, for instance, argue that the purposes and requirements of the consent decree continue to deserve weight ______________ even if it is assumed that a defendant has come into compliance with the bedrock obligations imposed by the Constitution. Thus, the plaintiffs would argue that the Commissioner's and the Sheriff's announced intention to abandon single-celling a requirement of the consent decree but not necessarily of the Constitution is enough to demonstrate that the time is not yet ripe to vacate the decree. The Supreme Court's decision in Rufo itself lends ____ some support to the plaintiffs' position in this regard, where the issue before the court was the proposed modification of a consent decree, a proposal that may well be ____________ made even when the ongoing constitutional violations have not been entirely extirpated. See Rufo, 112 S. Ct. at 762-64. ___ ____ 9. The Commissioner asserts, and there appears to be no dispute, that the Nashua Street Jail, constructed in accordance with the decree, presently meets constitutional standards and has done so since it opened in May of 1990. The district court found that "[t]he Nashua Street [J]ail is a modern, seven-story structure of steel, concrete, and brick construction. It provides conditions of confinement far superior to those at the former Charles Street Jail, which had been determined to be below constitutionally mandated -16- period of time has passed during which such compliance has been achieved;10 and that it is unlikely that the original violations will soon be resumed if the decree were discontinued. Under this standard (a view we neither adopt nor reject), the Commissioner on this record has not made a showing adequate to oblige the district court to terminate the decree. Unlike the standard just described, the Commissioner's proposed formula for vacating the consent decree which we find too restrictive by any measure assumes that the district court is obliged to terminate whenever the existing constitutional violation has ceased. This approach gives insufficient weight to the problem of recurrence. To the extent that recurrence is taken into account, the Commissioner brushes the issue aside by proclaiming that the Supreme Court has made clear that double-celling is not a constitutional violation even for pretrial detainees. There are a number of flaws in his analysis. We accept entirely the proposition, established by the Supreme Court, that double-celling is not automatically ____________________ standards." Rufo, 148 F.R.D. at 17. ____ 10. The consent decree was entered in 1979, and was modified in 1985. The Commissioner's motion to vacate was filed in April of 1992, nearly two years after the Nashua Street Jail was opened to receive prisoners. -17- unconstitutional for pretrial detainees. See Bell v. ___ ____ Wolfish, 441 U.S. 520 (1979); see also Rhodes v. Chapman, 452 _______ ________ ______ _______ U.S. 337 (1981) (similarly as to convicted prisoners). But this is a far cry from the implicit position of the Commissioner that whatever double-celling may be contemplated by the Sheriff in the foreseeable future at the Nashua Street Jail is therefore clearly constitutional. We may assume that the housing of two detainees in a cell providing a large amount of space, with appropriate security measures to protect against inmate assaults, would be constitutional; but we think it obviously apparent that double-celling in very small quarters, with lack of security against assaults, and possibly other threats (e.g., disease) could violate due ____ process. And it is far from clear on the record before us that the immediate plans proposed by the Sheriff are constitutional, let alone any prospective next steps that might follow from the complete vacation of the consent decree. Looking only to the immediate future, we have here a prison facility that was expressly constructed under the consent decree on the assumption that it would house only one detainee per room unit. The size and security arrangements were specifically designed with that in mind, and certain of the "amenities," such as the use of a solid door with the small peep hold instead of bars, may increase the risk that -18- assaults on inmates would go undetected (double-celling resumed). Moreover, the rooms just meet the minima for single occupancy that are recommended by standard setting agencies.11 The district court also made findings that the risk of tuberculosis spreading in these close quarters, if double-celling were permitted, is a factor of importance. This is not to say that the Sheriff's double-celling plans for the Nashua Street Jail, or others that are proposed, may not yet be found constitutional. We say merely that whether they will be constitutional remains currently undecided and the answer is pivotal to whether vacating the decree will result in a recurrence of unconstitutional conditions, given that both the Commissioner and Sheriff are committed to double-celling unless otherwise ordered. Other longer term prospects of vacating the decree also give us pause. Even if the district court were to find that modification of the decree to accept the Sheriff's ____________________ 11. The court below found that: The present cells in the Nashua Street Jail were explicitly designed for single-bunking. They are slightly smaller in area than the cells in the old Charles Street facility. The contemporaneous views of expert consultants who participated in recommendations for design of the Nashua Street facility were that cells of this size were acceptable only because they were meant for single occupancy. Rufo, 148 R.F.D. at 21; see also Rufo, 112 S. Ct. at 755 n.3 ____ ________ ____ (listing state and national design standards). -19- proposed double-celling arrangements in certain cells satisfies constitutional minimums, it is by no means clear that the district court would also find that there is no likelihood that unconstitutional crowding would occur if the decree were entirely terminated. As we have said, even on the reading of the law that we think most favorable to the Commissioner, the district court would hardly be obliged to terminate the decree if it had substantial reason to fear that the constitutional conditions would be recreated soon after judicial oversight had been eliminated. It is a notorious fact that prisons are now desperately crowded and that the willingness of legislatures to fund new prison construction is limited by competing social needs and public resistance to increased taxes. Without knowing far more than this record reveals about the likelihood that the Sheriff would be in a position to resist such unconstitutional overcrowding, it is hardly possible to make a clear determination that the Dowell standard could be ______ satisfied in this case. One further consideration bears on our sense that the district court was entitled, at this stage, not to order termination of the decree. The district court did not wholly foreclose the possibility of double-celling; to the contrary, it invited the Sheriff, who is not a party to this appeal, to make a further showing with respect to his own double-celling -20- plans and alternatives to them. The Sheriff has made clear that he intends to do so.12 It appears certain that in such a proceeding further light would be cast on the impact of the Sheriff's proposal on the lives and conditions of the detainees. It seems to us that, where the constitutional status of the proposal is uncertain, the district court could reasonably consider first the lesser remedy of decree modification before definitively deciding whether the decree should be irreversibly terminated. A decision by the district court to allow some double-celling might satisfy the Commissioner despite his doctrinal objections to continued court supervision; but far more important, the district court could conclude on a more careful look at the Sheriff's embellished proposal that it would produce unconstitutional conditions, a conclusion that would provide ________________ an a fortiori basis for refusing to terminate the decree. __________ After all, if the Sheriff by his own admission is planning to introduce changes that the district court finds recreate the unconstitutional crowding violation, then one can hardly say that future violations are unlikely. ____________________ 12. The Commissioner is involved in this litigation not because he manages the Nashua Street Jail (that is the Sheriff's responsibility), but because he must assist the Sheriff in lodging surplus pretrial detainees who cannot be accommodated at the Nashua Street Jail. See Inmates of the ___ ______________ Suffolk County Jail v. Eisenstadt, 494 F.2d 1196 (1st Cir. ____________________ __________ 1974). -21- We recognize that the district court's reasons for refusing to terminate may be based on a reading of a governing law that is quite different from the arguendo ________ position we have described as the most favorable that the Commissioner could achieve. It could have been the district court's view that the termination was improper merely because it would frustrate an important object of the original decree single-celling or because the kind of considerations pertinent to decree modification (e.g., exploration of other ____ alternatives, financial stringency) have not been shown to favor the Commissioner. Still, we see no reason to grapple either with these matters or with related unsettled questions of governing law where, as here, the immediate outcome in the ongoing case appears to us correct and the issues that we leave to another day are difficult ones not clearly settled by Supreme Court precedent. Accordingly, whatever the district court may have intended, our affirmance of the court's refusal to terminate rests upon and is limited to the grounds we have just discussed: first, the absence of an adequate record to justify a complete decree termination at this time; and, second, the prospect of further proceedings in which additional light may be shed, not only on the basis for decree modification but also on issues that would clearly bear upon the decree's termination. On this basis, and with -22- these clarifications, we affirm the judgment of the district court. So ordered. __________ -23-